KAREN BRIDENSTINE, CONSERVATOR (GAIL M.
STALINSKI) ET AL. *v.* SAINT FRANCIS HOS-
PITAL AND MEDICAL CENTER ET AL.
(AC 33778)
(AC 33807)

Bear, Sheldon and Sullivan, Js.

Argued January 10—officially released May 28, 2013

*Thomas O. Anderson*, with whom, on the brief, was *Cristin E. Sheehan*, for the appellant in AC 33778 (defendant Connecticut Surgeons, LLC).

*William F. White*, pro hac vice, with whom were *Audrey D. Medd* and, on the brief, *Ryan K. Deady*, pro hac vice, and *Joann Provetto*, for the appellant in AC 33807 (defendant Jeannine Giovanni).

*Stephen M. Reck*, for the appellees (plaintiffs).

*Opinion*

SHELDON, J. The plaintiffs, Karen Bridenstine, previously in her capacity as conservator of Gail M. Stalinski and now as executrix of the estate of Gail M. Stalinski (decedent), and John Stalinski, brought this medical malpractice action against several health care providers claiming that they had deviated from the standard of care during their postoperative treatment of the decedent.[1] Prior to trial, the plaintiffs withdrew their complaint as to all defendants except Jeannine Gio-

---

[1] The plaintiffs asserted claims against Saint Francis Hospital and Medical Center, Saint Francis Care, Inc., Connecticut Surgeons, LLC, Woodland

vanni, a physician, and Connecticut Surgeons, LLC.[2] Following a trial, a jury returned a verdict in favor of the defendants. The plaintiffs moved to set aside the verdict and for a new trial on the basis that counsel for Giovanni improperly influenced the jury by asking improper questions that were statutorily prohibited by General Statutes § 19a-17b (d), the peer review statute,[3] and that they were thus deprived of a fair trial.[4] The trial court agreed with the plaintiffs and granted their motion to set aside the verdict and for a new trial, concluding that the line of questioning pursued by counsel for Giovanni was improper and resulted in a manifest injustice to the plaintiffs. The defendants now challenge that judgment on appeal.

The following factual and procedural history was set forth in the trial court's memorandum of decision in

Physician Associates, Inc., and physicians Carlos Barba, Jeannine Giovanni and Laurie Loiacono.

[2] Giovanni and Connecticut Surgeons, LLC, filed separate appeals to this court. We refer to them collectively as the defendants and individually by name.

[3] General Statutes § 19a-17b (d) provides: "The proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to the content of such proceedings; provided the provisions of this subsection shall not preclude (1) in any civil action, the use of any writing which was recorded independently of such proceedings; (2) in any civil action, the testimony of any person concerning the facts which formed the basis for the institution of such proceedings of which he had personal knowledge acquired independently of such proceedings; (3) in any health care provider proceedings concerning the termination or restriction of staff privileges, other than peer review, the use of data discussed or developed during peer review proceedings; or (4) in any civil action, disclosure of the fact that staff privileges were terminated or restricted, including the specific restriction imposed, if any."

[4] Although the plaintiffs cited two additional arguments in support of their motion to set aside the jury's verdict, the trial court rejected those arguments and they are not subject of this appeal.

which it granted the plaintiffs' motion to set aside the verdict. The decedent was admitted to St. Francis Hospital and Medical Center (St. Francis Hospital) for elective gastric bypass surgery, which was performed by Carlos Barba, a surgeon and a member of Connecticut Surgeons, LLC. Barba performed surgery on the decedent on a Monday and he also treated her postoperatively until the fifth day following the surgery, at which time he transferred the care of the decedent to Giovanni. Giovanni made rounds on Saturday morning and met briefly with the decedent. During the course of that Saturday, Giovanni received several phone calls from Scott Ellner, a hospital resident physician who was monitoring the decedent's condition. On Saturday afternoon, because of changes in her condition, Giovanni ordered that the decedent be transferred to the intensive care unit. Laurie Loiacono was the attending physician for the intensive care unit that afternoon and evening. While the decedent was in the intensive care unit, she suffered a code, during which she stopped breathing and her heart stopped pumping blood through her body. Although the physicians in the intensive care unit, with the assistance of other medical personnel, were able to get the decedent intubated and restart her heart, it became clear that she had an infectious process in her abdomen. Giovanni was called back to the hospital and she performed surgery on the decedent, during which she discovered and fixed a leak at the surgical bypass site. The decedent ultimately recovered from the infection caused by the leak at the operative site, but never recovered from the anoxic brain injury that she had suffered when her brain was deprived of oxygen during the code. She survived for a period of approximately seventeen months in a persistent vegetative state and then died.

The plaintiffs commenced this action asserting medical negligence claims against the health care providers responsible for the decedent's care. Prior to trial, the

plaintiffs withdrew their claims against some of these health care providers. Subsequent to those withdrawals, the remaining defendants, Giovanni and Connecticut Surgeons, LLC, filed notices of their intent to seek apportionment of responsibility with the former defendants, Saint Francis Hospital, Saint Francis Care, Inc., Woodland Physician Associates, Inc., Barba and Loiacono (apportionment defendants).

At trial, the plaintiffs acknowledged that they had previously claimed that the apportionment defendants had been negligent in their care of the decedent, but that they were no longer parties to this case, and they argued that Giovanni and Connecticut Surgeons, LLC, were also negligent and, in fact, were more responsible for the injuries suffered by the decedent. The plaintiffs principally claimed that Giovanni breached the standard of care in not timely diagnosing and treating the leak that caused the decedent's postoperative infection. The plaintiffs argued that if corrective surgery had been timely performed, the decedent likely would not have suffered a code and the consequent anoxic brain injury. In response to the plaintiffs' claims, the defendants essentially denied that Giovanni herself was negligent and contended, instead, that the apportionment defendants had breached the standard of care, essentially adopting the plaintiffs' former claims of negligence against those now apportionment defendants. Giovanni was critical of the care provided by the apportionment defendants, stating that, in her opinion, they had deviated from the standard of care in their treatment of the decedent.

On January 27, 2011, during the third week of the four week trial, during the direct examination of Giovanni, her attorney, William F. White,[5] asked her the following sequence of questions:

---

[5] Attorney White is not a member of the Connecticut bar, but was licensed to practice law in the state of Rhode Island and had been admitted pro hac vice in this case to represent Giovanni.

"[Attorney White]: During the course of this entire litigation, from the time you were named a defendant up until today, has any one of the attorneys for [the decedent] or attorneys for any of the apportionment defendants ever asked you if your care of [the decedent] was reviewed and evaluated at St. Francis Hospital?

"[Giovanni]: No.

"[Attorney White]: Was it?

"[Giovanni]: Yes, it was.

"[Attorney White]: What was it—"

At that point, counsel for the plaintiffs objected to the line of questioning and the court excused the jury from the courtroom to hear argument from counsel. Counsel for the plaintiffs explained that he had objected on the ground that White was attempting to introduce before the jury evidence of peer review, which is expressly prohibited by statute. In support of his questioning in this regard, White asserted that he was attempting to introduce evidence that there had been "no finding of inappropriate care" on her part based upon her treatment of the decedent and that that testimony was admissible because the peer review privilege "rests with [Giovanni]" and she was waiving it. Following a lengthy colloquoy, the court concluded that the line of questioning was improper and thus sustained the plaintiffs' objection.[6] The court ordered that the

_____

[6] The following is the portion of the January 27, 2011 transcript that represents the entirety of the colloquoy at issue, which the trial court appended to its memorandum of decision:

"[Attorney White]: During the course of this entire litigation, from the time you were named a defendant up until today, has any one of the attorneys for the plaintiff or attorneys for any of the apportionment defendants ever asked you if your care of [the decedent] was reviewed and evaluated at St. Francis Hospital?

"[Giovanni]: No.

"[Attorney White]: Was it?

"[Giovanni]: Yes, it was.

"[Attorney White]: What was it—

"[Attorney Reck (counsel for the plaintiffs)]: Your Honor—

"[The Court]: Hold on. Let me excuse the jury.

"(Jury Excused.)

"Mr. Reck?

"[Attorney Reck]: Peer review—I couldn't get it. I couldn't get this information. There would be no way I could examine the people after she said it.

"It is clearly not allowed. Once again, he throws this stuff out which he knows shouldn't be brought up.

"[Attorney White]: Peer review, the privilege rests with who owns the privilege, and the privilege rested with St. Francis Hospital—I am not disputing that—and with the doctors who are there.

"Now, she is not revealing and has no intention of revealing anything about any co-defendant—excuse me, apportionment defendant, only about the fact that there was a finding as to her that there was no finding of anything done inappropriately.

"So the peer review privilege rested with St. Francis. He asked St. Francis people if there was peer review—

"[Attorney Reck]: Let's look at the transcripts and let's get the decision. I can't get it. I mean, you're going into an area that I could never cross-examine.

"[Attorney White]: There [is] no such thing as transcripts for those.

"[Attorney Reck]: Let's call everybody in then to court.

"[Attorney White]: And it's up to them whether they wish to waive their privilege.

"[Attorney Reck]: Whose privilege is it?

"[The Court]: What's the citation for the privilege?

"[Attorney Reck]: 19a-17b.

"[The Court]: 19a-17b.

"[Attorney Reck]: Your Honor, I tried to ask about peer review several times and they cut me off. I could never learn anything about what happened.

"[Attorney White]: I'm not disagreeing that you asked. That's why I prefaced the question; did she ever ask, did we ever assert the privilege. She was never asked. You did ask St. Francis; I'm conceding that.

"[Attorney Reck]: Your Honor, that's basically saying, okay, we've had a trial and now she is found not guilty; now we've got this trial. Plus it wasn't disclosed. I mean, it opens up a whole can of worms.

"[Attorney White]: What needs to be disclosed?

"[Attorney Reck]: There was no discovery on it.

"[The Court]: Counsel, counsel, hold on.

"This says the review, proceedings of a medical review committee conducting a peer review, shall not be subject to discovery or introduced into evidence in any civil action for or against a health care provider.

"Do you claim that you have an exception under that statute that's applicable in this state that would allow you to examine this witness in light of that statute?

"[Attorney White]: My understanding is the privilege as to her rested with her. And if the court's interpretation is no, then fine, then I will not go any further.

"My understanding was that the privilege rested with her and I conceded the St. Francis people were asked, but she was never asked.

"[The Court]: This says, shall not preclude in any civil action the use of any writing which was reported independently of such proceeding, and in any civil action the testimony of a person concerning the facts which form the basis for the institution of such proceedings of which he had personal

knowledge and acquired independent of such proceedings, and any proceedings concerning the termination or restriction of staff privileges other than peer review.

"Now even with the exception, it says in a civil action any use of any writing—that's not what we're talking about here. In any civil action the testimony of any person concerning the facts which form the basis for the institution of the proceedings of which he had personal knowledge. So clearly, the doctor can testify about the facts of her care.

"Three, any health care provider proceedings regarding the termination or restriction of privileges, which did not occur.

"Four, in any civil action disclosure of the fact that staff privileges were terminated or restricted.

"Tell me where in that statute you think that this doctor can say I was exonerated?

"[Attorney White]: I'm not saying that she is exonerated. She's saying there was no action and no finding of inappropriate care. That was what she was notified of.

"Your Honor, I believe that the privilege rests with the doctor, and if St. Francis were here, clearly they would own it.

"[The Court]: Show me where. Otherwise, counsel, I am very unhappy with the opening of this subject where the statute clearly prevents it, A, from discovery, because it's not fair to Attorney Reck or Mr. and Mrs. Stalinski—and this is Mr. Stalinski—and Ms. Bridenstine that you're relying, in fact, on the finding that they were not privileged to participate in; they don't know what information that the peer review committee had. And it just seems to violate all sorts of kind of our fair play and disclosure.

"Mr. Anderson [(counsel for Connecticut Surgeons, LLC)], do you wish to be heard on this?

"[Attorney Anderson]: No, Your Honor. But I'm trying to figure out a way for everybody here to deal with this situation, and I have a suggestion.

"[The Court]: Well, I'm listening.

"[Attorney Anderson]: What was the exact question asked?

"[The Court]: Gail, could you read that back.

"(Court reporter reads back.)

"[Attorney Anderson]: My suggestion, Your Honor, from Attorney Reck's perspective he's looking at this saying, you know, the prejudice is going to be a finding of exoneration. But with this sort of hanging out there, I think that it would be consistent with the statute and in accordance with the statute to say based on that peer review, were your privileges in any way suspended, you know, whatever else the exception is. Your Honor read it. And that way it sort of washes over what I think Your Honor is concerned about with respect to Attorney Reck.

"[Attorney Reck]: Your Honor, I have one more thing to add. During the deposition—can I just say this. The thing that really, really bothers me about Attorney White—

"[The Court]: What I want you to do is direct your argument to the legal issue here.

"[Attorney Reck]: Yes. But the first thing that I have to say is that he throws this stuff out there, and then it's too late, and the cat is out of the

bag. When you know, you know this stuff about Social Security disability benefits; you know stuff about peer review. You know this stuff is going to be objected to.

"[The Court]: Mr. Reck, I am going to ask you to direct your argument toward the legal issue before the court.

"[The Court]: The legal issue. During the deposition of Dr. Giovanni at page 54, the answer from Dr. Giovanni:

" '[Answer]: I believe it was reviewed at an M&M, so I know I had seen —

" '[Attorney White]: You're not going to get into anything that was done at the M&M'—which is peer review.

"[The Court]: Do you agree that M&M is peer review? What does M&M stand for?

"[Attorney White]: Mortality and morbidity.

"[Attorney Reck]: So Attorney White said you're not going to get into anything that was done at the M&M.

"[The Court]: If that's an accurate reading of the deposition, I'm very unhappy that the subject was even broached in front of the jury. Because under the statute, peer review is privileged; it can't be discovered and it can't be used or introduced into evidence. And the sole purpose of questioning her on whether or not she was ever disciplined or her privileges restricted, you know, as a result of this care would in effect saying the peer review for the morbidity and mortality said that she did okay.

"So I'm going to sustain the objection. And what I'm inclined to do in front of the jury is to say that the question that you heard, the objection was sustained, and that the only review of the care of Dr. Giovanni that's an issue in this court is going to be done by the jury in this case.

"[Attorney Reck]: Your Honor, that's fine. The problem is, you know, it still got out.

"[The Court]: Do you have a better idea?

"[Attorney Reck]: I mean I think he should be sanctioned; that it should not have been asked. I think that should be told to the jury.

"[The Court]: Do you want me to hold a hearing now?

"[Attorney Reck]: I'm sorry, what was the question?

"[The Court]: Do you want me to hold a hearing now?

"[Attorney Reck]: Hold a hearing?

"[The Court]: On the sanction issue.

"[Attorney Reck]: Well, I mean, I think sanctions are in order. It keeps happening over and over again. And this is blatant. I mean peer review is always objected to and you can never get into it and everybody knows it, and then he just throws that thing out there like, oh my God, the doctor was exonerated by St. Francis. Now the jury is going to say, well, if St. Francis didn't find her at fault, so why should we?

"It's a huge, huge issue. It's outrageous. And if you're going to bring it up—he just sneaks it in there before anybody knows about it when he knows it's so unprofessional. He should be publically sanctioned. It came out.

"[The Court]: Mr. Reck, I am not going to take up the issue on sanctions. I will review that posttrial, if you care to file an appropriate motion to bring it to the court's attention.

"(Pause.)

questions be stricken and issued a curative instruction to the jury in which it instructed the jury to disregard the line of questioning at issue and reminded the members of the jury that they would be the judges of what the appropriate standard of care was in treating the decedent and whether Giovanni or any of the apportionment defendants had deviated from that standard of care.

The trial proceeded and ultimately ended with the jury entering a verdict in favor of the defendants. The plaintiffs thereafter filed a motion to set aside the verdict and for a new trial on the basis, inter alia, that the aforementioned questions by White regarding the peer review process unduly influenced the jury and thereby caused them a manifest injustice and deprived them of their right to a fair trial. In response to the plaintiffs'

"This is what I intend to say on the record and I will hear your comments so we don't get any issues.

"I am going to sustain the objection to the line of questions. It was an improper line of questions based upon our General Statutes. I am ordering that the witness' response to the previous two questions be stricken. In this case you are the judges of what the standard of care is that is applicable to Dr. Giovanni and the other apportionment defendants, and you are also the sole judges of whether or not Dr. Giovanni or the apportionment defendants have deviated from the standard of care.

"Mr. Reck, do you wish to be heard?

"[Attorney Reck]: That's fine, Your Honor.

"[The Court]: Mr. White?

"[Attorney White]: That's fine, Your Honor.

"[The Court]: Mr. Anderson.

"[Attorney Anderson]: Yes.

"[The Court]: Bring the panel in. (Jury returns.)

"Ladies and gentlemen, I have sustained the objection to the last two questions. They were an improper line of inquiry or questioning based upon our General Statutes. I am ordering that those responses to the last two questions be stricken, and you may not refer to them or consider them in your deliberations.

"In this case you, the members of the jury, will be the judge of what standard of care is applicable to Dr. Giovanni or the apportionment defendants, and you will be the judges of whether or not Dr. Giovanni or any of the apportionment defendants have deviated from the standard of care. And there will be other issues I will instruct you on, but at this point I wanted to highlight that. You may inquire, Mr. White."

motion, the defendants[7] objected on the bases that Giovanni "neither discussed peer review proceedings nor was the jury poisoned." In support of that position, the defendants claimed that the line of questioning at issue "encompassed a total exchange of 20-30 seconds" and that it "cannot be said to even come close to rising to the level of [an] exceptional case . . . ." The defendants claimed that "there was never any mention of the phrase 'peer review' nor any discussion of 'the proceedings of a medical peer review committee,' and there was not going to be any such discussion or testimony." They asserted that Giovanni "was never going to indicate that she was exonerated" and that any argument by the plaintiffs that she had intended to testify before the jury that "the hospital cleared [her]" was "completely false" and was not supported by the record. They also claimed that "[u]nder § 19a-17b (d) (4), it would have been appropriate to indicate that . . . Giovanni never had her privileges terminated or restricted . . . ." Even if that were not the case, the defendants argued, because none of that testimony was actually presented to the jury due to the plaintiffs' immediate objection, the plaintiffs could not possibly have been prejudiced.

The court agreed with the plaintiffs and granted their motion to set aside the verdict and for a new trial. In so doing, the court explained: "The importance of these questions arises from the previously described posture of this medical malpractice case. At the time of trial, [the plaintiffs] had withdrawn [their claims] against [the apportionment defendants], but these former parties were brought back into the litigation [by the defendants] as apportionment defendants. Thus the issue before the jury was not whether medical negligence had occurred, but rather whether . . . Giovanni had been negligent

---

[7] Connecticut Surgeons, LLC, filed an objection to the plaintiffs' motion in which it adopted the arguments made by Giovanni.

in addition to the negligence of the [apportionment] defendants or whether the [apportionment] defendants were solely responsible for the claimed injuries. The line of questions which are the subject of this motion would have put before the jury the fact that the St. Francis Hospital Peer Review Committee had reviewed the care provided by . . . Giovanni and come to the conclusion that no sanctions were merited. . . .

"The court will now review the sequence of questions in light of [our peer review statute]. It was [Giovanni's] position that she held a 'privilege' and she could waive it. [White] stated 'that's why I prefaced the question: did she ever ask, did we ever assert the privilege. She was never asked. [The plaintiffs' counsel] did ask St. Francis [Hospital]; I am conceding that.'

"A review of the trial transcript indicated that [White] had carefully planned how to put this information before the jury in light of the statutory pr[o]scription. The preamble to the question focused on the fact that [Giovanni] had not been asked by either [the plaintiffs] or the apportionment defendants if her care of the decedent 'was reviewed and evaluated at St. Francis Hospital.' In this manner the court believes [Giovanni] sought to deflect the anticipated argument that if 'privilege' had been claimed at deposition, that a later waiver of the privilege would be ineffective. She sought, in the words of her counsel, to state that 'there was a finding as to her that there was no finding of anything done inappropriately.'

"There is an additional difficulty with [Giovanni's] position that she never asserted a privilege in pretrial discovery proceedings. Portions of [her] deposition [testimony] . . . were included by [the plaintiffs] in support of this motion. As [the] plaintiffs' [counsel] was inquiring whether and when she had seen a particular study, her response referenced the peer review process.

[White] interjected, 'You are not going to get into anything that was done at the M&M (Mortality and Morbidity) . . . . If the only place that you saw that and reviewed it was at the medical peer review do not go there. If you saw it someplace else then you may discuss it.' (Deposition of Jeannine Giovanni, August 26, 2004, p. 513–54). Clearly, [White] was properly raising the statutory prohibition against discovery and directing his client not to answer questions posed by [the plaintiffs'] counsel. [White] may not have used the word 'privilege' in his objection and instructions to his client but the effect was the same.

"In [her] posttrial brief . . . [Giovanni] argues that 'neither the peer review proceedings or the results thereof were going to be revealed or were not revealed.' The court transcript supports the assertion that [she] did not get a chance to testify that her care had been reviewed and [that] she had not been sanctioned. It does not support her claim that the proceedings of the peer review process were not going to be revealed. It is clear from the colloquy regarding the objection that the intent of the questioning was to allow Giovanni to reveal that there was a peer review process with regard to the care of the decedent and that the . . . care [that she had provided] had not been criticized.

"The court notes that, as this line of questioning was proceeding, the court was very concerned about its direction. It was waiting for an objection from [the plaintiffs]. The moment plaintiffs' counsel stood up and said 'Your Honor,' the court interrupted the questioning and excused the jury. Three people were speaking at once and [the] court has a question [in its] mind whether, despite the professionalism of the court reporter/stenographer, all of the dialogue and any response of the witness before the jury was excused, [were] captured.

"The defendants have not provided any persuasive legal authority to support the argument that . . . Giovanni was in a position to assert or waive a 'privilege.' Thus the court is presented with a deliberate and planned series of questions seeking to put before the jury information that the jury was statutorily barred from receiving. Although the full response to the series of questions was not provided, by this time in the trial the jury had heard the testimony of [the plaintiffs'] experts and all of the physicians who were residents or fellows at St. Francis [Hospital] and the attending physician for the [intensive care unit]. Each of th[o]se witnesses was cross-examined by the defendants about the quality of their care.

"Further, prior to the posing of the peer review questions . . . Giovanni in her direct examination had described her care of [the decedent] and directly and indirectly criticized the care of the [apportionment] defendants. Thus, the stage had been set for the revelation that one of these [apportionment] defendants had reviewed the care [provided by] Giovanni and had not sanctioned her.

"The posing of this particular sequence of questions was akin to a statement by counsel. The jury was aware that these individuals were apportionment defendants that . . . Giovanni claimed were solely responsible for the injuries suffered by [the decedent]. It is unlikely that the jury missed the import of the questions being posed by [White] to his client with regard to whether her care had been 'reviewed and evaluated at St. Francis Hospital.' . . .

"As the previous discussion demonstrates, the court is of the opinion that the [questions posed by White were improper]. [He posed] a series of questions [that] sought to put before the jury evidence that is barred by statute. Even though the ultimate answer was not

provided by the witness, the clear inference that [White] was asking the jury to consider was that the apportionment defendant had absolved . . . Giovanni of responsibility. The jury was well aware of the apportionment claims being made. Further, this line of question[ing] occurred during the presentation of the defense in this case when [White] was arguably attempting to elicit testimony that would be favorable to his client's position. The line of questioning implicitly made the jury aware of the peer review process. As such it opened up a Pandora's box. It was a series of questions somewhat akin to those types of questions where counsel need not care about the answer or [whether] an objection is sustained [because] the purpose of the question can be achieved without a response. [For example], 'When did you stop beating your wife?' Once the jury knew that . . . Giovanni's care was evaluated at St. Francis Hospital, it was not necessary for [Giovanni] to tell the jury that she had not been sanctioned by the peer review process conducted at St. Francis Hospital. Why would [Giovanni] and her counsel have brought up this event unless they considered it favorable to the positions she was asserting?

"A core responsibility of a judge presiding over a jury trial is to ensure that each of the parties before it receives a fair trial. This responsibility is carried out in the particulars by a court's ruling on motions, on objections to questions or exhibits and when instructing the jury on the law that is applicable to the claims or defenses asserted. The attorneys for the parties are obligated to zealously advocate for their clients' position and to marshal admissible evidence in support of that cause. Disagreements [as to] the appropriateness of a line of questions may require the court to issue a limiting instruction when these predictable disagreements arise in front of the jury. As neither the court [n]or the parties are privy to the jury's deliberations,

the impact and the curative force of these instructions is unknowable.

"The court is of the opinion that the [plaintiffs] . . . have demonstrated a manifest injury to their right to have a fair trial. The court is mindful that the granting of a new trial is an exceptional remedy."

"In reaching this conclusion, the court is aware that it gave a strong curative instruction to the [members of the] jury immediately upon their return to the courtroom and that [the plaintiffs] had not moved for a mistrial. Even if [the plaintiffs] had moved for a mistrial at that time, the court would not have granted the motion, but, rather, would have taken it under advisement. The parties were in the third week of a four week trial. The parties had invested an additional period of weeks in selecting a jury. The jurors had invested a substantial amount of their time. The jury had already heard the testimony of approximately eight physicians or medical professionals. In this case, there were sufficient practical reasons to proceed to the conclusion of the trial.

"With regard to the curative instruction, the court presumes, as it must, that the jurors followed its instructions. Sometimes, however, curative instructions may be insufficient. . . . In this case, the questions posed by [White] invited the [members of the] jury to consider what they should not. The questions went to the heart of the [defendants'] claims, that they did not want to be tarred with [the] medical negligence of the apportionment defendants. While that is a proper argument, it cannot be supported by evidence of what occurred in the peer review process. The posing of this series of questions caused a manifest injury to [the plaintiffs'] ability to have a fair trial.

"The court has also considered the relative strengths and weaknesses of [the plaintiffs'] claims and the defendants' defenses in reaching the decision to grant this

motion. If the court [were] of the opinion that no reasonable jury could have reached a verdict in favor of the plaintiff, then it would not be granting this motion. In this case, however, each party, in the court's opinion, provided evidence that would support a verdict in their favor. In such a vigorously prosecuted and defended case, the court cannot rule out that the improper line of questions unduly influenced the .jury. This line of questioning regarding peer review related directly to this hotly contested and pivotal issue of liability between the defendants and the apportionment defendants.

"Thus, after careful consideration, the court finds that in this exceptional case, the plaintiffs' motion for a new trial must be granted. The court is mindful of the substantial expense involved in the trial of a medical malpractice case such as this one. Here, [White] intentionally posed a series of questions to [Giovanni] that improperly brought to the jury's attention the peer review process. It was a clever attempt, but an improper one. Even with the curative instruction, the court is not satisfied that [the plaintiffs'] right to a fair trial was preserved. This situation and result could have been avoided by the defendants, but they have brought these consequences upon themselves. The defendants may have a credible defense but the process has been poisoned." (Citations omitted.)

The defendants thereafter filed motions to reargue and for reconsideration of the court's decision setting aside the jury's verdict and ordering a new trial. In her motion to reargue, Giovanni argued that the line of questioning at issue was not improper because § 19a-17b (d) allows for the introduction of evidence that a medical practitioner's privileges have not been terminated or restricted and that the peer review proceedings were not going to be discussed. Giovanni also reiterated her contention that, even if the line of questioning had

been improper, it had not resulted in any prejudice to the plaintiffs.

Connecticut Surgeons, LLC, filed its own motion for reargument and reconsideration of the court's decision setting aside the verdict and ordering a new trial, in which it claimed (1) that "the decision should be reconsidered because none of the part[ies] brought controlling appellate precedent to the court's attention . . . [and] [s]uch authority holds that a curative instruction is the proper method to quell any prejudice where objectionable evidence was insufficient to warrant a mistrial"; (2) that the court improperly applied the legal standard applicable to improper comments made during closing arguments because there was no such comment made in this case; (3) that the jury's verdict did not "hinge on any testimony that it was ordered to disregard"; (4) that the court's decision was inconsistent in that the court surmised that the jury followed its curative instruction relating to the allegedly improper line of questioning, but, nevertheless set aside the verdict on the basis that the plaintiffs were prejudiced by that line of questioning; and (5) that the court's decision relied on its "mischaracterization of the purpose and effect of . . . Giovanni's apportionment complaint."

The court denied the defendants' motions for reargument and reconsideration, stating: "The court has reviewed the request for reconsideration and reargument. The brief[s] and motion[s] do not identify cases or issues that the court did not consider when rendering its initial decision. The motion[s are] denied." These appeals followed.

"The proper appellate standard of review when considering the action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard. . . . In determining whether there has been

an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done. . . . [T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror . . . but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did. . . . In reviewing the action of the trial court in denying [or granting a motion] . . . to set aside the verdict, our primary concern is to determine whether the court abused its discretion. . . . The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to [the] evidence. Moreover, the trial judge can gauge the tenor of the trial, as [this court], on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 698–99, 41 A.3d 1013 (2012).

On appeal, the defendants claim that the court erred in granting the plaintiffs' motion to set aside the jury's verdict and ordering a new trial. Giovanni claims that the challenged line of questioning was not improper[8] and both defendants claim that the plaintiffs did not suffer a manifest injustice as a result of that line of questioning.[9] We disagree with both claims.

[8] We note that Connecticut Surgeons, LLC, does not challenge the trial court's finding that the line of questioning at issue was improper.

[9] The defendants also claim (1) that the court improperly applied the law regarding objectionable comments made by counsel during closing arguments, rather than the law regarding objectionable witness testimony, and (2) that the court was inconsistent in positing that the jury likely heeded its curative instruction, but, nevertheless setting aside its verdict. The defendants raised these claims for the first time before the trial court in their respective motions to reargue and reconsider the court's decision setting aside the verdict and ordering a new trial, which the court summarily denied.

Giovanni argues that the line of questioning was not improper because it was never intended to elicit testimony regarding peer review and that, even if that was the intention, it never came to fruition because the plaintiffs timely objected. Giovanni claimed that it was the intention to ask only whether or not her privileges were restricted or terminated, which, she alleges, is permitted under § 19a-17b (d) (4). The trial court specifically found that Giovanni's questioning was not, in fact, intended to be so limited and that she had intended to and, in fact did, delve into the prohibited subject of peer review. The court's finding is supported by the transcript of the colloquoy that occurred upon the plaintiffs' objection to the challenged line of questioning, cited fully in footnote 6 of this opinion, which reveals that Giovanni took the position during trial that she could simply waive the peer review "privilege," not that she was going to testify only that her privileges had not been restricted or terminated by Saint Francis Hospital.

The trial court further found that, although they may not have gotten so far as to specifically address the peer review proceedings and results, the questions that the jury heard were tantamount to the proverbial ringing of the bell; that, in other words, the answer did not matter because the question itself provided the answer and the inferences to be drawn therefrom. Although the court stated that "each party [had] provided evidence that would support a verdict in their favor," we believe that that statement, when read in the context of the entirety of the court's decision, is a reference to the evidence without regard to the improper questioning. The trial court's unequivocal determinations that the line of questioning was improper and that it had caused a manifest injustice to the plaintiffs support

Because the court provided no explanation of the factual or legal bases for the denial of the defendants' motions, we are unable to conclude that the court's decision thereon constituted error.

such a construction. The court was persuaded that the improper questioning tainted the trial and skewed the evidence such that the plaintiffs were denied their right to a fair trial. The trial court was in the best position to sense the atmosphere of the trial and to assess its probable effect of the improper questioning and its implications on the jury's deliberative process. On that basis, it determined that the plaintiffs had been prejudiced by the questioning, and thus that they were entitled to a new trial. Because the trial court's judgment must be afforded great weight, and this court is in no position to second-guess its carefully considered ruling, we cannot conclude that the court erred in finding that the plaintiffs were prejudiced and were deprived of a fair trial. We therefore conclude that the court did not abuse its discretion in setting aside the verdict and ordering a new trial.[10]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[10] We also affirm the court's order requiring local counsel to be present at all further proceedings in this matter.