J-A11003-22

2022 PA Super 199

CHRISTIANA SANDERS AND BRYAN
SANDERS, AS CO-ADMINISTRATORS
OF THE ESTATE OF M.S., AND
CHRISTIANA SANDERS AND BRYAN
SANDERS, IN THEIR OWN RIGHT

       v.

THE CHILDREN'S HOSPITAL OF
PHILADELPHIA

             Appellant

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 646 EDA 2021

Appeal from the Order Entered March 12, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 171204286

SHEILA LIMPREVIL, AS CO-
ADMINISTRATOR OF THE ESTATE OF
L.G.W., AND SHEILA LIMPREVIL, IN
HER OWN RIGHT AND TERRELL
WILLIAMS, AS CO-ADMINISTRATOR
OF THE ESTATE OF L.G.W., AND
TERRELL WILLIAMS, IN HIS OWN
RIGHT

       v.

THE CHILDREN'S HOSPITAL OF
PHILADELPHIA

             Appellant

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 648 EDA 2021

Appeal from the Order Entered March 12, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 180802309

| | | |
|---|---|---|
| COURTNEY GILL, AS ADMINISTRATRIX OF THE ESTATE OF T.C.G., AND COURTNEY GILL AND TERRENCE GILL, IN THEIR OWN RIGHT | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| THE CHILDREN'S HOSPITAL OF PHILADELPHIA | : : | |
| Appellant | : : | No. 659 EDA 2021 |

Appeal from the Order Entered March 12, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 180900385

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

OPINION BY BOWES, J.: **FILED NOVEMBER 22, 2022**

Before us are three consolidated interlocutory appeals from orders which, *inter alia*, overruled the privilege objections of Children's Hospital of Philadelphia ("CHOP") to the discovery requests of the appellees (collectively "Plaintiffs"), who are the parents and estate administrators of three infants who died after contracting an adenovirus in CHOP's neonatal intensive care unit ("NICU").[1]  We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

---

[1]  This Court has jurisdiction over these appeals because they are from collateral orders that are immediately appealable pursuant to Pa.R.A.P. 313. **See**, **e.g.**, **Farrell v. Regola**, 150 A.3d 87, 95 (Pa.Super. 2016) ("When a party is ordered to produce materials purportedly subject to a privilege, we have jurisdiction under Pa.R.A.P. 313." (cleaned up)).

**I.     Facts and Procedural History**

Twenty-three infants, including Plaintiffs' decedents, contracted an adenovirus in CHOP's NICU in the late summer of 2016.  CHOP's Infection Prevention & Control ("IP&C") Department became aware of the cluster of adenovirus cases on August 22, 2016.  It therefore began an investigation pursuant to CHOP's IP&C Plan "to find the cause and stop the outbreak," led by Dr. Julia Sammons, CHOP's attending infectious disease physician, chair of the IP&C Committee, and a member of CHOP's Patient Safety Committee. Sammons Deposition, 10/6/20, at 40.  Dr. Sammons reported to Dr. Jan Boswinkel, CHOP's designated Patient Safety Officer pursuant to the Medical Care Availability and Reduction of Error ("MCARE") Act, 40 P.S. §§ 1303.101-1303.910.

The fruits of the investigation were as follows.  Dr. Sammons discovered that the common event experienced by all infected babies was a retinopathy of prematurity ("ROP") eye examination.  ***See*** Sammons Deposition, 10/6/20, at 32.[2]  Subsequent testing of the equipment used in the examinations, namely a hand-held lens and an indirect ophthalmoscope that never came in contact with the patients, revealed the presence of the adenovirus.  ***Id***. at 32-35.  After observing the physicians perform ROP examinations, Dr. Sammons

_____

[2]  Dr. Sammons's deposition appears in the certified record as Exhibit B to Plaintiffs' Reply to CHOP's Response to Plaintiffs' Motion to Strike Privilege Objections filed on February 4, 2021.

ultimately concluded that the virus was transmitted to each of the patients by the doctor touching the contaminated equipment and then touching the babies. *Id*. at 38-40. Accordingly, while CHOP had no hand hygiene or equipment-specific cleaning policies for ROP examinations prior to the outbreak, CHOP instituted both hand hygiene protocols and required bleach cleaning of the equipment as a result of the investigation. *Id*. at 36, 123, 131.

In the process of gathering the information to make the above discoveries, conclusions, and recommendations, the following meetings occurred. Dr. Sammons reported to the Patient Safety Committee on August 25, 2016, regarding the investigation to date. The Committee requested that Dr. Sammons persist with her efforts and continue to provide updates. *See* Sammons Affidavit, 2/19/21, at 2-3.[3] Between August 24 and September 6, 2016, Dr. Sammons periodically held "safety huddles" with members of the IP&C Department and with doctors and nurses in the NICU, involving the sharing of PowerPoint slides on August 24, 25, 29, 30, and 31, as well as September 2, and 6, 2016. *Id*. at 4-5. While these safety huddles were "frequently coordinated with the Patient Safety Officer," many of these meetings "were impromptu *ad hoc* meetings" outside of the established

---

[3] Dr. Sammons's affidavit appears in the certified record as Exhibit A to CHOP's Supplemental Brief in Opposition to Plaintiffs' Motion to Strike Privilege Objections filed on February 19, 2021.

Patient Safety Committee meetings for the collection and review of data. *Id*. at 3; Sammons Deposition, 10/6/20, at 216. In addition to the sharing of information, the meetings involved the evaluation of the actions of professional health care providers, the quality of patient safety measures, and recommendations for new or modified patient safety methods. *Id*. at 3.

On September 14 and October 12, 2016, Dr. Sammons and other members of the IP&C Department reported to the IP&C Committee, utilizing PowerPoint slides. These presentations involved the evaluation of IP&C and NICU providers, discussions of possible improvements to health care quality, and suggestions for new procedures and the monitoring of compliance therewith. *Id*. at 6. A similar presentation, also including PowerPoint slides, was given to CHOP's Patient Safety Committee on September 22, 2016. *Id*.

CHOP held several Morbidity and Mortality ("M&M") conferences related to the outbreak. Specifically, on September 26, 2016, Dr. Sammons and other doctors, utilizing PowerPoint slides, presented a Patient Safety M&M at Dr. Boswinkel's request as a subcommittee of the Patient Safety Committee. *Id*. at 7-8. On October 4, 2016, PowerPoint presentations were made in furtherance of "peer review and improving the quality of health care" to professional health care providers at NICU and Ophthalmology M&M conferences "to evaluate the services performed by other professional health care providers, conduct practice analysis, and recommend improvements for . . . services provided to CHOP patients." *Id*. at 8-9. Similar programs, with

slides, were presented at CHOP Ophthalmology Residents and Surgical Division Chiefs M&M conferences on October 10 and 11, 2016, respectively, as well as at the University of Pennsylvania's Scheie Eye Institute's M&M Grand Rounds Conference on January 17, 2017. *Id*. at 9-11.

In the meantime, CHOP's Patient Safety Committee directed a formal root cause analysis ("RCA") of the outbreak which resulted in an RCA report. That report, which was submitted to the Patient Safety Committee, summarized the gathering and evaluation of the information about the outbreak and proposed a plan for preventing another one. *Id*. at 11. The RCA report was presented to the Patient Safety Committee at its November 17, 2016 meeting.

Believing that the transmission of the virus through ophthalmology equipment that does not come into direct contact with the patient was a novel finding, Dr. Sammons also published an abstract and article about the outbreak. Neither utilized any of the documents created during the course of the investigation, but referenced the facts of the outbreak. Additionally, one month after the outbreak, Dr. Monte Mills, the chief of CHOP's Ophthalmology Division, and Dr. Albert Maguire, an ophthalmologist who was not part of the NICU treating team, exchanged emails concerning Dr. Maguire's desire to discuss the finding of the investigation in a paper. The subject of the email was "NICU consult hygiene/infection control."

In December 2017 and August 2018, Plaintiffs filed survival and wrongful death actions against CHOP alleging medical malpractice. Specifically, Plaintiffs contended that CHOP was negligent in failing to follow proper procedures for disinfecting the ophthalmology equipment. During the course of discovery, Plaintiffs issued discovery requests to which the above-identified documents were responsive. CHOP compiled a privilege log identifying the documents and asserting privilege. CHOP also produced affidavits from Drs. Sammons and Boswinkel asserting that the documents at issue were created at the behest of CHOP's Patient Safety Committee and Officer for purposes of complying with its obligations pursuant to the MCARE Act and "to conduct peer review." ***See***, ***e.g.***, Boswinkel Affidavit, 2/19/21, at 6.[4]

The trial court conducted an *in camera* review of the documents and entertained written argument from the parties concerning the import and consistency of the affidavits and the deposition testimony of Dr. Sammons about the context and purposes of her investigation into the outbreak. Thereafter, the trial court determined that CHOP failed to establish that certain of the documents discussed above were privileged under the Peer Review Protection Act ("PRPA") or MCARE, and ordered their production to Plaintiffs.

---

[4] Dr. Boswinkel's affidavit appears in the certified record as Exhibit B to CHOP's Supplemental Brief in Opposition to Plaintiffs' Motion to Strike Privilege Objections filed on February 19, 2021.

This timely appeal followed, and both CHOP and the trial court complied with Pa.R.A.P. 1925.

CHOP presents the following two claims on appeal:

1.  Whether the trial court erred and abused its discretion in concluding that a hospital failed to establish that certain documents prepared for peer review and patient safety purposes (including the hospital's Root Cause Analysis, PowerPoint presentations, meeting minutes, intranet postings and emails) were protected from discovery by the [PRPA] or the [MCARE Act] where:  (1) the materials were prepared in accordance with the statutes' respective requirements; (ii) the hospital identified the bases for each privilege on logs and affidavits; and (iii) the hospital protected the documents from the public disclosure?

2.  Whether the trial court erred and abused its discretion in concluding that a defendant hospital waived its right to claim protection under the PRPA and MCARE simply by publishing an article and an abstract about the subject matter of documents where:  (1) the article and abstract merely referenced facts from the privileged documents but did not disclose the documents themselves; (ii) nothing in any statute or common law supports a finding of waiver; and (iii) the article and abstract provided potentially lifesaving information about a novel medical finding; thus, any decision requiring the documents to be disclosed violates public policy?

CHOP's brief at 4.  As CHOP's two questions present intertwined concepts, we address each aspect organically within our discussion rather than as distinct issues.

## II.  Applicable Law

Initially, we note the general legal principles that guide our review.  "The issue of whether materials are privileged is a question of law."  **Meyer-Chatfield Corp. v. Bank Fin. Servs. Grp.**, 143 A.3d 930, 937 (Pa.Super. 2016).  Therefore, this Court conducts a *de novo*, plenary review.  **Id**.  To the

extent that our review entails statutory interpretation, it also implicates questions of law subject to *de novo*, plenary review. **See**, **e.g.**, **Commonwealth v. Chesapeake Energy Corp.**, 247 A.3d 934, 942 (Pa. 2021). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "The plain language of the statute is the best indicator of the legislature's intent. To ascertain the plain meaning, we consider the operative statutory language in context and give words and phrases their common and approved usage." **Chesapeake Energy Corp.**, **supra** at 942.

It is well-settled that evidentiary privileges are disfavored, and that their use should be permitted "only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." **BouSamra v. Excela Health**, 210 A.3d 967, 975 (Pa. 2019) (cleaned up). Regarding the respective duties of the parties when a privilege is invoked, we have observed that "[t]he party invoking a privilege must initially set forth facts showing that the privilege has been properly invoked." **Yocabet v. UPMC Presbyterian**, 119 A.3d 1012, 1019 (Pa.Super. 2015) (cleaned up). "Once the invoking party has made the appropriate proffer, then the burden shifts to the party seeking disclosure to set forth facts showing that disclosure should be compelled either because the privilege has been waived or because an exception to the privilege applies." **Id**. (cleaned up).

### A.    The PRPA

Turning to the specific privileges at issue in this appeal, we first examine the scope of the peer review privilege codified by the PRPA.[5]   Having determined that, "because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities," our legislature enacted the PRPA "to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public[.]"  *Reginelli v. Boggs*, 181 A.3d 293, 300 (Pa. 2018) (cleaned up).  The act encourages the "the increased use of peer review groups by giving protection to individuals and data who report to any review group[.]"  *Leadbitter v. Keystone Anesthesia Consultants, Ltd.*, 256 A.3d 1164, 1169 (Pa. 2021) (cleaned up).  "These types of protections are viewed as helpful in fostering effective peer review because of the perceived reluctance of members of the medical community to criticize their peers and take corrective action."  *Id*.  In sum, "the PRPA is designed to foster candor and frankness in the creation and consideration of peer-review data by conferring immunity from liability, as well as confidentiality — all with the objectives of improving the quality of

---

[5] On August 29, 2022, Plaintiffs filed an application for post-submission communication suggesting that we consider this Court's decision in *Williams v. GEO Grp., Inc.*, ____ A.3d ____, 2022 PA Super 148, 2022 WL 3640469 at *4 (Pa.Super. Aug. 24, 2022), in connection with the reach of the PRPA's privilege.  Since that decision was withdrawn by order of October 19, 2022, we deny the application.

care, reducing mortality and morbidity, and controlling costs." ***Leadbitter***,

***supra*** at 1169.

The confidentiality provision of the PRPA is as follows:

The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, [t]hat information, documents or records otherwise available from original sources are not to be construed as immune from discovery or used in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings.

63 P.S. § 425.4. The definition section of the PRPA includes the following

terms:

**"Peer review"** means the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations. . . .

**"Professional health care provider"** means:

(1) individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including, but not limited to, the following individuals or organizations:

(i) a physician;

. . . .

(viii) a registered or practical nurse;

. . . .

(x) an administrator of a hospital, nursing or convalescent home or other health care facility; or

(xi) a corporation or other organization operating a hospital, nursing or convalescent home or other health care facility[.]

. . . .

**"Review organization"** means any committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee, a hospital plan corporation review committee, a professional health service plan review committee, a dental review committee, a physicians' advisory committee, a veterinary review committee, a nursing advisory committee, any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies, to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care. It shall also mean any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto. It shall also mean a committee of an association of professional health care providers reviewing the operation of hospitals, nursing homes, convalescent homes or other health care facilities.

63 P.S. § 425.2. The term "review committee" is not defined in the PRPA, but has been determined to mean "any committee that undertakes peer review."

*Leadbitter*, *supra* at 1176 (cleaned up). The word "proceedings" also is not included in the definition section of the PRPA, but has been interpreted to include a claim or other document received by a committee member in his official capacity that initiates the peer review process. *See Steel v. Weisberg*, 534 A.2d 814, 817 (Pa.Super. 1987).

Where a committee does not exclusively perform peer review functions, "only peer-review documents are [subject to the privilege], and not the committee's documents more broadly." *Id*. at 1178 n.19. The privilege does not "protect non-peer review business records, even if those records eventually are used by a peer review committee." *Dodson v. DeLeo*, 872 A.2d 1237, 1243 (Pa.Super. 2005). As we explained:

> a hospital cannot create protection for a document simply by sending it to the peer review committee. On the other hand, documents generated by a peer review committee specifically for use in the peer review process are not discoverable simply because some of the information contained therein is available elsewhere. To hold otherwise would have a chilling effect on the peer review process and would clearly run afoul of the purpose of the statute.

*Id*. at 1244 (cleaned up).

In other words, the scope of the privilege afforded by the PRPA "is limited to documents of a review committee that it utilized when it engaged in peer review." *Id*. (cleaned up). As such, the PRPA offers privilege only to materials prepared in furtherance of "(i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii)

establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care." 63 P.S. § 425.2.

### B.    The MCARE Act

The MCARE Act was enacted to further the following policies: "to ensure that medical care is available in this Commonwealth through a comprehensive and high-quality health care system" and "to reduce and eliminate medical errors by identifying problems and implementing solutions that promote patient safety." 40 P.S. § 1303.102(1), (5). The patient safety chapter of the MCARE Act, 40 P.S. §§ 1303.301-1303.315, "relates to the reduction of medical errors for the purpose of ensuring patient safety." 40 P.S. § 1303.301.

For example, § 307(b)(3) requires medical facilities to develop and implement patient safety plans that, *inter alia*, establish a system for its health care workers to report serious events[6] and incidents.[7] Section § 309 provides that a patient safety officer must "[e]nsure the investigation of all reports of

---

[6]  A serious event is "[a]n event, occurrence or situation involving the clinical care of a patient in a medical facility that results in death or compromises patient safety and results in an unanticipated injury requiring the delivery of additional health care services to the patient. The term does not include an incident." 40 P.S. § 1303.302.

[7]  The definition of the term "incident" excludes serious events and states that it is "[a]n event, occurrence or situation involving the clinical care of a patient in a medical facility which could have injured the patient but did not either cause an unanticipated injury or require the delivery of additional health care services to the patient." 40 P.S. § 1303.302.

serious events and incidents," take any action "immediately necessary to ensure patient safety as a result of any investigation," and to report actions taken as a result of an investigation to promote patient safety to the patient safety committee. 40 P.S. § 1303.309(2)-(4). As for the composition of a patient safety committee, the MCARE Act specifies as follows:

> A hospital's patient safety committee shall be composed of the medical facility's patient safety officer and at least three health care workers of the medical facility and two residents of the community served by the medical facility who are not agents, employees or contractors of the medical facility. No more than one member of the patient safety committee shall be a member of the medical facility's board of trustees. The committee shall include members of the medical facility's medical and nursing staff. The committee shall meet at least monthly.

40 P.S. § 1303.310(a)(1).

Pursuant to § 308, "A health care worker who reasonably believes that a serious event or incident has occurred shall report the serious event or incident according to the patient safety plan of the medical facility unless the health care worker knows that a report has already been made." 40 P.S. § 1303.308(a).

Subsection 310(b) imposes on a medical facility's patient safety committee the obligations to:

> (1) Receive reports from the patient safety officer pursuant to section 309.
>
> (2) Evaluate investigations and actions of the patient safety officer on all reports.
>
> (3) Review and evaluate the quality of patient safety measures utilized by the medical facility. A review shall include the

- 15 -

consideration of reports made under sections 304(a)(5) and (b), 307(b)(3) and 308(a).

(4) Make recommendations to eliminate future serious events and incidents.

(5) Report to the administrative officer and governing body of the medical facility on a quarterly basis regarding the number of serious events and incidents and its recommendations to eliminate future serious events and incidents.

40 P.S. § 1303.310(b).

Since a patient safety committee organized pursuant to § 310(a)(1) of the MCARE Act includes members of the community that are not professional health care providers, the patient safety committee cannot constitute a peer review committee whose proceedings are protected by the PRPA. ***See Ungurian v. Beyzman***, 232 A.3d 786, 800 (Pa.Super. 2020) ("Because the Patient Safety Committee includes members of the community served by Hospital, the Committee is not exclusively comprised of 'professional healthcare providers.' Accordingly, Hospital failed to satisfy its evidentiary burden of proving the applicability of the PRPA privilege to the Patient Safety Committee Meeting Minutes."). Instead, the MCARE Act contains a separate confidentiality provision which provides as follows in pertinent part:

**(a) Prepared materials.--**Any documents, materials or information solely prepared or created for the purpose of compliance with section 310(b) or of reporting under section . . . 307(b)(3), 308(a), 309(4), [or] 310(b)(5) . . . which arise out of matters reviewed by the patient safety committee pursuant to section 310(b) . . . are confidential and shall not be discoverable or admissible as evidence in any civil or administrative action or proceeding. Any documents, materials, records or information that would otherwise be available from original sources shall not

be construed as immune from discovery or use in any civil or administrative action or proceeding merely because they were presented to the patient safety committee . . . .

**(b) Meetings.--**No person who performs responsibilities for or participates in meetings of the patient safety committee . . . pursuant to section 310(b) shall be allowed to testify as to any matters within the knowledge gained by the person's responsibilities or participation on the patient safety committee . . . provided, however, the person shall be allowed to testify as to any matters within the person's knowledge which was gained outside of the person's responsibilities or participation on the patient safety committee . . . pursuant to section 310(b).

**(c) Applicability.--**The confidentiality protections set forth in subsections (a) and (b) shall only apply to the documents, materials or information prepared or created pursuant to the responsibilities of the patient safety committee . . . set forth in section 310(b).

40 P.S. § 1303.311.

Hence, to be privileged pursuant to the MCARE Act, the materials must: (1) be solely prepared for compliance with an enumerated MCARE Act duty, (2) arise out of matters reviewed by the patient safety committee in accordance with § 310(b), and (3) not be otherwise available from original sources. ***See*** 40 P.S. § 1303.311(a). ***See also Venosh v. Henzes***, 11 CV 3058, 2013 WL 9593953 (Lackawanna County C.C.P. July 17, 2013), *aff'd*, 105 A.3d 788 (Pa.Super. 2014) (unpublished memorandum) (gleaning from the plain language of § 311 the foregoing three requirements for MCARE Act confidentiality to apply).

## III.  Analysis

We now proceed to apply the above statutes to each of the documents at issue in this appeal *seriatim*.

### A.    The Root Cause Analysis Report

The trial court ruled that the RCA report was not protected because "CHOP has failed to meet their burden in proving which specific privilege applies supported by sufficient information proving that this report was created specifically for the hospital's event reporting system or peer review committee meeting by including such information as who prepared the report and when it was prepared."  Trial Court Opinion, 7/19/21, at 8.

The trial court's conclusion is belied by the record.  CHOP produced the affidavit of Dr. Boswinkel, CHOP's designated Patient Safety Officer pursuant to the MCARE Act, who indicated that the report was prepared by a "root cause analysis team" at the behest of the Patient Safety Committee.  ***See*** Boswinkel Affidavit, 2/19/21, at 5.  The report was marked as confidential and annotated with "Peer Review/MCARE Protected" and was submitted to the Patient Safety Committee and presented at its November 17, 2016 official meeting.  ***Id***. at 6.   The function of the root cause analysis report was to satisfy "the responsibilities of the Patient Safety Committee under MCARE Act Section 310(b), including evaluating the quality of patient safety measures in place and recommending steps to eliminate future series events and incidents," as well as the duty "as the Patient Safety Officer under MCARE Act Section 309(4) to report to the Patient Safety Committee regarding actions taken to promote patient safety."  ***Id***.   CHOP also produced Dr. Sammons's affidavit which indicated that she was a member of the root cause analysis team and that the

- 18 -

team compiled the report and presented it to the Patient Safety Committee at Dr. Boswinkel's direction to evaluate the existing patient safety measures and recommend steps to eliminate future serious events. *See* Sammons Affidavit, 2/19/21, at 11.

Plaintiffs rightly argue in their brief that the root cause analysis report was not protected by the PRPA. *See* Plaintiff's brief at 30-32. We agree that CHOP did not establish that the PRPA privilege attached to the root cause analysis. *See Ungurian v. Beyzman*, 232 A.3d 786, 798 (Pa.Super. 2020) (concluding that the hospital's failure to establish that the members of the root cause analysis team were "professional healthcare providers" defeated a claim of PRPA privilege).

However, Plaintiffs' only argument against MCARE Act privilege is that, because it "was created first to aid the response" to the outbreak and then later submitted to the Committee, it was not "solely" created to satisfy MCARE Act obligations and, consequently, was not privileged. *Id*. at 31 (quoting not the evidence of record but COP's appellate brief). We disagree.

The lack of detail as to the timing of the report's creation or the members of the root cause analysis team is immaterial to the applicability of the MCARE confidentiality provision.[8] The evidence of record detailed above demonstrates that CHOP met its burden of establishing that the root cause

---

[8] Of note, this Court was not presented with a claim of MCARE Act privilege in *Ungurian v. Beyzman*, 232 A.3d 786, 798 (Pa.Super. 2020).

analysis report was (1) solely prepared for compliance with the MCARE Act duties for the Patient Safety Officer to report, and the Patient Safety Committee to receive, accounts of investigations into serious events and suggestions to improve patient safety; (2) arose out of matters that were indeed reviewed by the patient safety committee in accordance with § 310(b); and (3) was not otherwise available from original sources. *See* 40 P.S. § 1303.311(a). Therefore, pursuant to § 311(a), the root cause analysis document prepared for compliance with § 310(b) is itself subject to the privilege. Thus, we reverse the portion of the trial court's order directing CHOP to produce the root cause analysis report stamped Sanders CHOP PRIV 000033-000039.

## B. PowerPoint slides

As detailed in our factual history above, Dr. Sammons prepared and presented PowerPoint slides on numerous occasions during and after the outbreak, namely: in "safety huddles" between August 24 and September 6, 2016; at Infection Prevention & Control meetings on September 14 and October 12, 2016; at M&M conferences held with CHOP personnel on September 26, October 4, October 10, and October 11, 2016; and at the Scheie Eye Institute M&M conference on January 12, 2017.

The trial court lumped all the PowerPoint presentations together and concluded that the materials "were not created for purposes of peer review triggering MCARE or PRPA protections." Trial Court Opinion, 7/19/21, at 8.

- 20 -

Rather, it determined that the documents were created in the course of addressing and stopping the outbreak and that they were only later sent to the peer review committee "in an effort to obtain privileged status." *Id*. at 9. Further, the court determined that, by "announcing the investigations, findings, and remedial actions taken based upon the investigation" to the public in the article and abstract, CHOP waived the right to PRPA and MCARE protections concerning the investigation and remedial measures. *Id*. at 13.

CHOP contends that different privileges applied to different PowerPoint presentations. Specifically, it asserts that the presentations at the "safety huddles" are protected by MCARE; the presentation to the M&M conferences and at the Scheie Eye Institute were peer review meetings protected by the PRPA; and the presentations to the Infection Prevention & Control meetings are protected by both acts. *See* CHOP's brief at 40. CHOP argues that the trial court's focus on when the documents were created rather than the reason for it is unsupported in the law. *Id*. at 41.

We first observe that the statutory privileges are not waived or otherwise invalidated by the fact that details of how the outbreak occurred and the measures that were ultimately implemented to reduce the risk of future outbreaks may have been disclosed in a published article and abstract.[9]

---

[9] On appeal, Plaintiffs distance themselves from any claim that waiver was applicable, insisting that the trial court did not rule that any of the documents at issue were discoverable based upon waiver of a privilege, but instead
*(Footnote Continued Next Page)*

*See Dodson*, *supra* at 1244 (explaining that a privileged document does not become discoverable "simply because some of the information contained therein is available elsewhere").

Both the PRPA and the MCARE Act include varying protections for both documents and information, and provide, absolutely and without exception, that the protected materials shall not be discoverable or admissible, and that no one is permitted to testify in a civil action about protected information such as testimony before a committee or opinions formed as a result of committee meetings. *See* 63 P.S. § 425.4; 40 P.S. § 1303.311(a), (b). Both statutes, however, allow for the disclosure by committee members of information within their personal knowledge gleaned outside of their participation in the confidential proceedings.[10] *Id*.

Our prior discussion of the law indicates that both statutory privileges were designed to foster the frank and open discussion of the quality of health care services provided without fear that such will be used against the hospital or other professional health care providers in litigation. However, the disfavor

_____

because CHOP "failed to substantiate that any of the materials at issue in this appeal met the qualifications for privilege." Plaintiffs' brief at 46.

[10] For example, as our summary at the outset of this opinion reveals, in her deposition Dr. Sammons provided Plaintiffs with factual information that was within her personal knowledge concerning the outbreak, the investigation, and CHOP's response to it, rather than information she gleaned through protected materials or meetings. However, counsel did not permit Dr. Sammons to testify about information that she obtained from a peer review meeting. *See* Sammons Deposition, 10/6/20, at 323.

with which evidentiary privileges are viewed remains. Thus, our legislature carefully chose language to establish that, while the facts and information independently brought into confidential meetings and investigations may be discoverable, the documents created for and proceedings themselves are what is privileged. As a court in one of our sister states aptly observed:

> Regardless of how information is used for improvement purposes or discussed by one party or entity outside of the process, the statute clearly does not intend that the peer review process should be voided, waived, or destroyed. To hold otherwise subverts [the statute] and the purpose of the peer review process. One has only to read the statute to realize the . . . General Assembly did not create a privilege so frail and delicate as to be shattered by a mere reference to findings arising from the peer review process. If one cannot use the information generated from a peer review, the entire process is nullified and the statutory intent defeated.

*Stewart v. Vivian, M.D.*, 2012-Ohio-228, 2012 WL 195020 at *8 (Ohio App. Jan. 23, 2012).

Having rejected the notion of waiver, we consider whether the PowerPoint slides are materials protected by either statute, beginning with the "safety huddle" documents. CHOP maintains that the "safety huddles" were meetings of the patient safety committee in compliance with § 310(b) of MCARE, rendering slides created solely for presentation there to be privileged under § 311(a). Plaintiffs assert that the "slides were not formulated within a patient safety committee convened to evaluate the hospital's response to a serious event," but rather "as part of CHOP's active response to an ongoing patient care emergency[.]" Plaintiff's brief at 25-26.

- 23 -

The affidavits of Drs. Boswinkel and Sammons indicate that the *ad hoc* meetings held in the NICU from the time the cluster of infections was reported until September 6, 2016, were in fulfillment of Dr. Boswinkel's ongoing duty as Patient Safety Officer pursuant to § 309 to "[e]nsure the investigation of all reports of serious events and incidents," to take any action "immediately necessary to ensure patient safety as a result of any investigation," and to report actions taken as a result of an investigation to promote patient safety to the patient safety committee. 40 P.S. § 1303.309(2)-(4). **See** Boswinkel Affidavit, 2/19/21, at 2-3; Sammons Affidavit, 2/19/21, at 3-4.

As such, these documents were not some form of incident reports or other mere business records designed to document the occurrences for future litigation or risk management. **See Atkins v. Pottstown Mem'l Med. Ctr.**, 634 A.2d 258, 260 (Pa.Super. 1993) (holding incident report prepared for risk manager was an unprivileged business record because it was not part of an evaluation or review by a peer review committee); **Venosh**, **supra** at *11 (holding event reports were not privileged where there was no evidence that they were generated to comply with an MCARE patient safety reporting requirement or ever reviewed by the patient safety committee). Rather, the evidence produced by CHOP established that the documents were (1) solely prepared for compliance with the MCARE Act duties for the Patient Safety Officer to conduct investigations into serious events and suggestions to improve patient safety; (2) arose out of matters that were indeed reviewed

by the patient safety committee in accordance with § 310(b); and (3) were not otherwise available from original sources. *See* 40 P.S. § 1303.311(a). Accordingly, we reverse the trial court's order to the extent that it compelled production of the slides stamped Sanders CHOP PRIV 000044-000107.

For the same reasons, the PowerPoint slides prepared following the completion of the investigation for presentation at the formal Patient Safety Committee Meeting conducted on September 22, 2016, and the Safety M&M conference on September 26, 2016, are confidential materials pursuant to §§ 310(b) and 311 of the MCARE Act. *See* Boswinkel Affidavit, 2/19/21, at 3-5. We therefore reverse the trial court's order insofar as it requires CHOP to produce the documents stamped Sanders CHOP PRIV 000122-000159.

Finally, we consider the PowerPoint slides prepared for the other M&M conferences held at CHOP and the Scheie Eye Institute Grand Rounds Conference. As noted above, CHOP asserts that these are peer review materials that are protected by the PRPA. Plaintiffs contend that CHOP's claim that these documents were privileged was properly rejected because, by not identifying each person who attended the M&M conferences, CHOP "failed to satisfy its burden to prove that the people who heard Dr. Sammons'[s] lectures were even capable of conducting peer review" or that the meetings were organized for evaluation "of the quality and efficiency of services ordered or performed by other professional health care providers." Plaintiffs' brief at 42.

We agree with CHOP that it produced evidence to show that these documents fell squarely within the protections of § 425.2 of the PRPA. As noted above, that section extends privilege to materials prepared for "(i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care." 63 P.S. § 425.2. Contrary to Plaintiffs' assertions, Dr. Sammons's affidavit expressly indicates that each of the conferences was attended exclusively by professional health care providers and that the "slides were intended only for purposes of conducting peer review and improving the quality of health care." Sammons Affidavit, 2/19/21, at 8-10, 12.

Indeed, morbidity and mortality conferences attended solely by professional health care providers are precisely the peer review actions that the PRPA was designed to encourage. As CHOP notes, one court recently observed that to find that M&M materials were not protected by the PHRA "would contravene the precise purpose for which [the PRPA's] protections were enacted." CHOP's brief at 43 n.27 (quoting **Morrissey v. Geisinger Cmty. Med. Ctr.**, 3:19-CV-894, 2020 WL 6877183, at *3 (M.D. Pa. Nov. 23, 2020)). **See also Bridenstine v. Saint Francis Hosp. & Med. Ctr.**, 68 A.3d 127, 133 (Conn. App. 2013) (affirming trial court ruling based upon its finding that the happenings at an M&M conference were subject to peer review privilege). Therefore, we reverse the trial court's direction for CHOP to

produce the documents stamped Sanders CHOP PRIV 000129-000216 and 000221-000245.

### C. PowerPoint Slides and Minutes from IP&C Committee meetings on September 14 and October 12, 2016

The trial court considered together Dr. Sammons's PowerPoint slides presented at IP&C Committee meetings and the resultant meeting minutes. Although the IP&C Committee is a peer review committee, the trial court concluded that meetings were "held to address and stop the outbreak" and not for purposes of peer review committee. *See* Trial Court Opinion, 7/19/21, at 8. The court likened the documents to incident reports that were submitted to cloak them with privilege. *Id*. Plaintiffs agree, and further argue that the documents were not solely prepared as part of the Patient Safety Committee's evaluation of CHOP's response to the outbreak, but rather "they were a part of the response itself." Plaintiffs' brief at 35.

CHOP argues that the minutes from meetings of the IP&C Committee, a designated peer review committee, are protected by both the PRPA and MCARE. *See* CHOP's brief at 40. It contends that the purpose of the meetings was to evaluate the ophthalmologists' practice, the outbreak response, and compliance with CHOP procedures, as well as to discuss steps to improve healthcare quality and patient safety in the future. *Id*. at 15.

Our review of the certified record reveals that CHOP produced evidence to support these contentions. Specifically, the affidavit and deposition testimony of Dr. Sammons provides that the IP&C Committee is a peer review

sub-committee of the Patient Safety Committee that conducts investigations and reports to the Patient Safety Committee. Dr. Sammons prepared slides to present at meetings to assist it in "evaluating the outbreak response by Infection Prevention providers and NICU providers, evaluated the ophthalmologists' practices, discussed monitoring of compliance with policies and procedures and evaluated next steps to prevent recurrence." Sammons Affidavit, 2/19/21, at 6. The Committee further discussed its upcoming reports to the Patient Safety Committee. *Id*.

Again, § 310(b) of the MCARE Act tasks a patient safety committee with, *inter alia*, evaluating investigations directed by the patient safety officer, reviewing and evaluating the quality of the hospital's patient safety measures, and making recommendations to eliminate future serious events. *See* 40 P.S. § 1303.310(b)(2)-(4). That is precisely what Dr. Sammons described. The notion proffered by Plaintiffs and accepted by the trial court that a patient safety committee must merely accept incident reports and not perform a review and evaluation or recommend changes in procedures until after a serious event has completely run its course is irrational and unsupported by the language of the MCARE Act. On the contrary, such is the exact type of frank, open, and proactive proceedings that the Act sought to implement in furtherance of its goal "to reduce and eliminate medical errors by identifying problems and implementing solutions that promote patient safety." 40 P.S. § 1303.102(5). Therefore, without having to consider the PRPA, it is clear to

us that the slides Dr. Sammons presented at the IP&C Committee meetings and the minutes taken of those meetings are privileged by § 311(a). Consequently, we reverse the trial court's order to the extent that it mandated production of the documents stamped Sanders CHOP PRIV 000006-000032, 000108-000122, and 000217-220.

**D.    PowerPoint slides from the Patient Safety Committee meeting on September 22, 2016**

The next document at issue involves the slides Dr. Sammons presented at the Patient Safety Committee meeting that the IP&C Committee discussed in the documents we just reviewed.  CHOP again asserts MCARE Act privilege, and Plaintiffs again contend that the slides were part of the response rather than a review of the hospital's response.  *See* Plaintiff's brief at 37.  For the reasons offered above, we conclude that CHOP established that the documents were utilized in the report to the Patient Safety Committee in accordance with § 310(d) of the MCARE Act and are consequently protected by § 311(a). Hence, we reverse the trial court's order to the extent that it mandated production of the documents stamped Sanders CHOP PRIV 000122-000128.

**E.    Intranet postings to CHOP personnel about the outbreak**

The next documents at issue identified in CHOP's privilege log were two postings on CHOP's intranet website:  one in August 2016 entitled "CHOP Serious Safety Events" and one in February 2017 entitled "Learning from our Safety Events."  The trial court ruled that no privilege applied to these materials, which were available to all CHOP personnel who had access to a

computer. In doing so, the court did not offer a detailed analysis of the document which it described as a "job ad." *See* Trial Court Opinion, 7/19/21, at 8.

CHOP argues that these intranet posts fell within the MCARE privilege because they "notified CHOP personnel of events for the purpose of compliance with (d) of the section 310(b) or of reporting under section 309(4), and arise out of matters reviewed by the patient safety committee pursuant to section 310(b) or the governing board of a medical facility pursuant to section 310(b)." CHOP's brief at 18.

We disagree. Dr. Boswinkel's affidavit indicates that the purpose of the posts "was to notify CHOP personnel of events to increase awareness, encourage learning from events, and to recommend actions to prevent future serious events or incidents." Boswinkel Affidavit, 2/19/21, at 7. Further, the communications "accomplish the general purposes of promoting patient safety, quality improvement, and improving patient care." *Id*.

The MCARE Act does not protect any and all materials involving patient safety. Rather, it addresses in §§ 309 and 310(d) reports **to** the patient safety committee and the committee's **internal deliberations** about what occurred and what altered policies might better serve patient safety. CHOP points to nothing within the MCARE Act that protects subsequent communications **from** the patient safety committee to the institution at large announcing the new policies decided upon as a result of their confidential proceedings. We discern

- 30 -

no provision of the Act that expresses an intention to forever shield from discovery hospital policies that arose from patient safety committee meetings. Rather, it seeks to protect the confidentiality of the investigation and assessment of the serious events that occasioned the policies.

Therefore, CHOP has failed to establish that the trial court committed an error of law in ordering the production of the intranet posts stamped Sanders CHOP PRIV 000040-000043.

### F. Redacted ophthalmology emails

Finally, CHOP argues that the trial court erred in ordering the full disclosure of what it describes as "redacted ophthalmology emails (CHOP PRIV 280-285)." CHOP's brief at 45. It maintains that "[t]he redacted portion of the emails contained information that is protected from disclosure pursuant to the MCARE and peer review privileges because it references action plans that were part of the peer review process and taken under MCARE precautions." *Id*. at 45-46.

That is the extent of CHOP's argument. It offers no indication that it provided the trial court with evidence that these emails were made pursuant to a peer review evaluation or in furtherance of MCARE reporting. Instead, CHOP appears to assert, as it did with the intranet postings, that the emails contain information about the new policy or procedures that resulted from the earlier peer review or patient safety proceedings. As such, CHOP failed to meet its burden of establishing that these emails were privileged

communications within CHOP's peer review or patient safety apparatus. Hence, we have no cause to disturb the trial court's ruling as to these documents.

## IV.   Conclusion

We understand that Plaintiffs have the ultimate burden of proving that their heartbreaking losses resulted from CHOP's negligence, and that accessing the documents at issue would lighten that burden.  However, our legislature has recognized that the public has a competing, compelling interest in creating an environment in which improving the quality of health care by examining and learning from past incidents is not eschewed for fear that the honest assessment thereof could be used against health care providers to impose legal liability.  In this vein, we find our Supreme Court's observations on the effects of peer review privilege are applicable to both of the confidentiality provisions at issue in this appeal:

> We recognize that the statutory privilege as thus understood may prevent civil plaintiffs from obtaining some documents tending to show that their injuries were caused by the defendant's negligence, whether it be that of the physician or the facility at which he or she maintains privileges.  However, the legislative body is presumed to have balanced that consideration against others, discussed above, which may be in tension with it, and to have intentionally used language applying to a variety of committees whose proceedings and records involve peer review [and MCARE Act patient safety reporting]. . . .
>
> [T]he convergence of medicine and litigation at times brings about discordant results:  the furtherance of one end may commensurately disadvantage the other.  All privileges necessarily hinder to some degree the information available to opposing litigants.  Similarly, assigning paramount status to a

plaintiff's pursuit of a legal remedy can strike a fatal blow to a procedural framework erected to enhance patient safety. The General Assembly, in enacting [the statutory privileges], clearly voiced an intention to allow for the confidentiality necessary for meaningful peer [and MCARE Act] review.

***Leadbitter supra*** at 1177–78 (cleaned up).

We have made our rulings herein to fulfill our duty to ensure the faithful application of the policy determinations and interest-balancing enacted by the Commonwealth's elected representatives.

Orders affirmed in part and reversed in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judge Stabile joins this Opinion.

Judge McLaughlin files a Concurring & Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/22/2022

- 33 -