J-A11003-22

2022 PA Super 199

| CHRISTIANA SANDERS AND BRYAN SANDERS, AS CO-ADMINISTRATORS OF THE ESTATE OF M.S., AND CHRISTIANA SANDERS AND BRYAN SANDERS, IN THEIR OWN RIGHT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| v. | : | |
| | : | No. 646 EDA 2021 |
| THE CHILDREN'S HOSPITAL OF PHILADELPHIA | : | |
| Appellant | : | |

Appeal from the Order Entered March 12, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): No. 171204286

| SHEILA LIMPREVIL, AS CO-ADMINISTRATOR OF THE ESTATE OF L.G.W., AND SHEILA LIMPREVIL, IN HER OWN RIGHT AND TERRELL WILLIAMS, AS CO-ADMINISTRATOR OF THE ESTATE OF L.G.W., AND TERRELL WILLIAMS, IN HIS OWN RIGHT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | No. 648 EDA 2021 |
| v. | : | |
| THE CHILDREN'S HOSPITAL OF PHILADELPHIA | : | |
| Appellant | : | |

Appeal from the Order Entered March 12, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): No. 180802309

| COURTNEY GILL, AS ADMINISTRATRIX OF THE ESTATE OF T.C.G., AND COURTNEY GILL AND | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |

J-A11003-22

TERRENCE GILL, IN THEIR OWN     :
RIGHT                            :
                                 :
                                 :
                                 :
        v.                       :   No. 659 EDA 2021
                                 :
                                 :
THE CHILDREN'S HOSPITAL OF       :
PHILADELPHIA                     :
                                 :

              Appellant

          Appeal from the Order Entered March 12, 2021
     In the Court of Common Pleas of Philadelphia County Civil Division at
                     No(s):  No. 180900385


BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

CONCURRING/DISSENTING OPINION BY McLAUGHLIN, J.:

**FILED NOVEMBER 22, 2022**

I agree with the majority that the Children's Hospital of Philadelphia ("CHOP") did not establish the intranet postings and the redacted ophthalmology emails were privileged. However, I respectfully disagree with the majority's conclusion that the remaining documents are protected by the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. §§ 1303.101-1303.910, or the Peer Review Protection Act ("PRPA"), 63 P.S. §§ 425.1-425.4.

The majority accurately sets forth the facts of this case. In the late summer of 2016, 23 infants contracted an adenovirus in CHOP's neonatal intensive care unit ("NICU"). CHOP's Infections Prevention & Control ("IP&C") Department investigated the outbreak. CHOP claimed myriad documents prepared in response to the outbreak were protected by either the PRPA or

- 2 -

MCARE. The trial court disagreed, finding certain documents, including a root cause analysis report, various powers point slides, meeting minutes, intranet postings, and an email, were not protected from disclosure by either statute. CHOP filed this appeal, again claiming the documents were protected from disclosure.

The party asserting an evidentiary privilege has the initial burden to "set forth facts showing that the privilege has been properly invoked." *Virnelson v. Johnson Matthey, Inc.*, 253 A.3d 707, 713 (Pa.Super. 2021) (citation omitted). If this initial burden is met, the party seeking disclosure then "must set forth facts showing that disclosure will not violate the privilege." *Id.* Evidentiary privileges are disfavored, and should be applied "only to the very limited extent that . . . excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *BouSamra v. Excela Health*, 210 A.3d 967, 975 (Pa. 2019) (citation omitted) (alteration in original).

The PRPA provides for the confidentiality of a review organization's records where the document arises out of matters that are the subject of evaluation and review by the committee:

> The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee[.]

63 P.S. § 425.4. The provision further provides that documents available from original sources are not protected merely because they are presented during committee proceedings:

> Provided, however, [t]hat information, documents or records otherwise available from original sources are not to be construed as immune from discovery or used in any such civil action merely because they were presented during proceedings of such committee[.]

*Id.*

The PRPA defines "peer review" as

> [T]he procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations. . . .

63 P.S. § 425.2. A "professional health care provider" is defined as "individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth[.]"

*Id.*

The PRPA defines "Review Organization" as follows:

> [A]ny committee engaging in peer review . . . to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care. . . .

*Id.*

MCARE also protects certain documents from discovery. It protects from disclosure documents prepared or created solely for the purpose of compliance with certain MCARE provisions, where the documents arise out of matters reviewed by the patient safety committee:

> Any documents, materials or information solely prepared or created for the purpose of compliance with section 310(b) or of reporting under section 304(a)(5) or (b), 306(a)(2) or (3), 307(b)(3), 308(a), 309(4), 310(b)(5) or 313 which arise out of matters reviewed by the patient safety committee pursuant to section 310(b) or the governing board of a medical facility pursuant to section 310(b) are confidential and shall not be discoverable or admissible as evidence in any civil or administrative action or proceeding.

40 P.S. § 1303.311(a) (footnote omitted). Similar to the PRPA, MCARE does not protect a document from disclosure if the document would be available from an original source:

> Any documents, materials, records or information that would otherwise be available from original sources shall not be construed as immune from discovery or use in any civil or administrative action or proceeding merely because they were presented to the patient safety committee or governing board of a medical facility.

*Id.*

The MCARE patient safety committee is to be composed of "the medical facility's patient safety officer and at least three health care workers of the medical facility and two residents of the community served by the medical facility who are not agents, employees or contractors of the medical facility." 40 P.S. § 1303.310(a)(1). The statute states that the committee's

responsibilities include receiving reports, evaluating the investigations and actions of the patient safety officer, reviewing and evaluating the quality of the facility's patient safety measures, making recommendations to eliminate future serious events, and reporting to the administrative officer and governing body:

> **(b) Responsibilities**.--A patient safety committee of a medical facility shall do all of the following:
>
> (1) Receive reports from the patient safety officer pursuant to section 309.
>
> (2) Evaluate investigations and actions of the patient safety officer on all reports.
>
> (3) Review and evaluate the quality of patient safety measures utilized by the medical facility. A review shall include the consideration of reports made under sections 304(a)(5) and (b), 307(b)(3) and 308(a).
>
> (4) Make recommendations to eliminate future serious events and incidents.
>
> (5) Report to the administrative officer and governing body of the medical facility on a quarterly basis regarding the number of serious events and incidents and its recommendations to eliminate future serious events and incidents.

*Id.* at § 1303.310(b) (footnotes omitted).

**Root Cause Analysis Report**

The Affidavit of Julia Sammons, M.D., M.S.C.E. states that "CHOP conducted a formal root cause analysis related to the adenovirus outbreak that occurred in CHOP's NICU in August-September 2016." Aff. of Julia Sammons, M.D., M.S.C.E., at ¶ 69 ("Dr. Sammons' Aff."). The Root Cause Analysis ("RCA") "summarized the root cause team's information gathering,

evaluation of the adenovirus outbreak, and included an action plan to prevent recurrence." *Id.* at ¶ 73. In her affidavit, Dr. Sammons stated that the "root cause analysis was initiated at the direction of the Patient Safety Committee through the Patient Safety Officer" and was submitted to the Patient Safety Committee in November 2016. *Id.* at ¶¶ 70, 76. Similarly, in his affidavit, Jan Boswinkel, M.D., stated that CHOP conducted a root cause analysis "at the direction of the Patient Safety Committee," the RCA "accomplished responsibilities of the Patient Safety Committee," and it was presented during the November 2016 meeting. Aff. of Jan Boswinkel, M.D., at ¶¶ 29, 32, 35.

The trial court found CHOP failed to meet its burden of proving the RCA is protected from disclosure by either the PRPA or MCARE. The court explained that CHOP did not provide sufficient information to establish the report was created specifically for the hospital's event reporting system or peer review committee meeting, noting CHOP did not include information as to who prepared the report or when it was prepared. Trial Court Opinion, filed July 19, 2021, at 8. It found the document was "not created for purposes of peer review but instead . . . to address and stop the outbreak." *Id.* at 9.

The majority found that although the RCA was not protected from disclosure by the PRPA, MCARE did protect it. It found CHOP met its burden of establishing the RCA was solely prepared for compliance with MCARE, arose out of matters that were reviewed by the patient safety committee, and not otherwise available from other sources. Majority at 20. I disagree. I would conclude, as the trial court did, that CHOP did not meet its burden.

- 7 -

Although Dr. Sammons and Dr. Boswinkel both state the Patient Safety Committee directed the preparation of the RCA and that the RCA was presented at the November 2016 meeting, neither provides details regarding when the request for the RCA was made, when RCA report was prepared, or who constituted the members of the root cause analysis team that prepared the report. I cannot agree that, by merely stating the Patient Safety Committee requested an RCA, CHOP established the RCA was created solely for compliance with MCARE. Rather, it had a dual purpose. I would agree with the trial court that the RCA was created, at least in part, in response to the Adenovirus outbreak. Because it was not solely created for the Patient Safety Committee, it is not protected by MCARE. **See** 40 P.S. § 1303.311(a). I would therefore conclude the trial court did not err.

**PowerPoint Slides and Meeting Minutes**

Dr. Sammons prepared and presented PowerPoint Slides at various meetings. The majority finds the PowerPoint Slides protected under MCARE or the PRPA. The majority also found the minutes from an IP&C meeting privileged. I disagree.

1. "Safety Huddle" PowerPoint Slides

Dr. Sammons presented PowerPoint Slides at "safety huddles" during August and September 2016. At her deposition, Dr. Sammons testified she led an investigation into the adenovirus outbreak in the NICU. N.T., Oct. 6, 2020, at 21. Her role was "to lead outbreak investigations and to communicate the findings." **Id.** at 21-22. She testified that one of the "primary activities"

- 8 -

in the "outbreak investigation" was "to communicate with the unit." *Id.* at 210. They therefore had "daily huddles and briefings . . . to ensure everyone knew where [her team was] in [the] investigation." *Id.* She testified that there were PowerPoint slides "prepared for communication to the NICU," and the slides "included general information around the cases and the case findings to date." *Id.* at 220. During the first week, the slides were updated daily. *Id.* at 221. The people attending the huddles differed, but "typically . . . include[d] representation from [IP&C], from the NICU, NICU leadership," risk managers, and possibly local safety quality specialists. *Id.* at 221.

The majority found the Safety Huddle PowerPoint slides protected from disclosure by MCARE. Majority at 24-25. I disagree and would find the slides are not protected under MCARE.

As with the RCA, CHOP failed to show the Safety Huddle PowerPoint slides were created solely for use by the Patient Safety Committee. Rather, Dr. Sammons' deposition testimony establishes the PowerPoint Slides were prepared during the effort to investigate and respond to the outbreak, not solely for the Committee. N.T., Oct. 6, 2020, at 21, 210, 220; Trial Ct. Op. at 8-9; *see* 40 P.S. § 1303.311(a). MCARE therefore does not prevent disclosure.

I also would find the PowerPoint slides not protected under the PRPA,[1] as CHOP did not establish the slides were created for peer review. As stated

---

[1] CHOP argues the Safety Huddle PowerPoint slides were protected under both statutes. CHOP's Br. at 39 n.25.

above, they were to investigate the outbreak and provide information regarding the investigation.

2. <u>PowerPoint Slides from the Patient Safety Committee Meeting on September 22 ,2016</u>

On September 22, 2016, Dr. Sammons and other individuals, "on behalf of the IP&C Committee and IP&C Department," reported to the Patient Safety Committee "regarding the adenovirus outbreak," and prepared a PowerPoint presentation for review by the Committee. Dr. Sammons' Aff., at ¶¶ 34-35. Dr. Sammons stated they "provided information to the Patient Safety Committee regarding the adenovirus outbreak investigation and discussed findings and next steps for purposes of promoting patient safety." *Id.* at ¶ 37.

The majority concludes the PowerPoint slides from the Patient Safety Committee meeting on September 22, 2016, are protected by MCARE.[2] Majority at 25. It finds the slides were prepared pursuant to Section 310(b) and 311, and therefore protected. I once again disagree.

I would conclude, as the trial court did, that CHOP did not establish the slides were protected. Dr. Sammons reported to the Patient Safety Committee as the hospital epidemiologist, on behalf of the IP&C committee, to advise on developments from the outbreak and next steps. She explained that the slides

_____

[2] CHOP does not argue the PowerPoint slides from the Patient Safety Committee Meeting are protected by PRPA. CHOP's Br. at 39 n.25.

described the outbreak and explained the hospitals steps to control it.[3] *Id.* This was part of a response to the outbreak, and therefore the slides were not created solely to further a task under Section 310(b).

3. M&M Conferences held at CHOP and at Penn's Scheie Eye Institute Ground Rounds Conference

CHOP held Morbidity and Mortality ("M&M") conferences related to the adenovirus outbreak. These included a CHOP Safety M&M meeting, a CHOP NICU M&M meeting, a CHOP Ophthalmology M&M meeting, a CHOP Ophthalmology Residents M&M meeting, and a CHOP Surgical Division Chiefs M&M meeting. *Id.* at ¶ 38. The CHOP Safety M&M conference was a sub-committee of the Patient Safety Committee. *Id.* at ¶ 40.[4] Dr. Sammons also gave a presentation to ophthalmologists at an M&M Ground Rounds at Penn Medicine's Scheie Eye Institute, where she was a faculty member. *Id.* at ¶¶ 77, 79. On her curriculum vitae, Dr. Sammons has the M&M conferences listed under "Major Academic and Clinical Teaching Responsibilities." CHOP's Resp.

---

[3] I also note here that the trial court reviewed the documents *in camera* and found the documents did not contain privileged information.

[4] Dr. Sammons stated that the NICU M&M conference attendees "consisted exclusively of professional health care providers, including NICU physicians and NICU nurses." Dr. Sammons' Aff., at ¶ 49. Similarly, the attendees at the Ophthalmology M&M conference "consisted exclusively of professional health care providers from CHOP's Division of Ophthalmology" and the attendees at the Ophthalmology Residents M&M consisted "exclusively of ophthalmology residents who provide care to patients at CHOP." *Id.* at ¶ 54, 60. In addition, the attendees at the Surgical Division Chiefs M&M "consisted exclusively of CHOP surgical division chiefs." *Id.* at ¶ 66.

in Opp'n to Pls.' Mot. to Strike CHOP's Privilege Objections to Pls.' Disc. Req. at Ex. A.

The majority concludes the PowerPoint slides presented at the Safety M&M conference was protected under MCARE. Majority at 25. I disagree, because, as with the other documents, there is no evidence the slides were created solely for compliance with MCARE.

The majority finds the slides presented to at the remaining M&M conferences are protected under the PRPA, because the conferences were attended solely by professional health care providers and the slides were intended for the purposes of conducting peer review and improving the quality of health care. Majority at 26-27.

I disagree, and would find the trial court did not err in finding CHOP did not establish the slides were protected under the PRPA. CHOP failed to prove the lectures were organized to evaluate the quality of healthcare provided, reduce morbidity or mortality, or establish and enforce guidelines, as required by the PRPA. *See* 63 P.S. §§ 425.2, 425.4. Rather, as indicated by Dr. Sammons's *curriculum vitae* the lectures were educational and training opportunities. Further, the trial court, who viewed the slides during *in camera* review, found the material in the slides had already been made public, and therefore the information would be in otherwise available sources. Trial Ct. Op. at 8.

4. PowerPoint Slides and Minutes from IP&C Meetings on September 14 and October 12, 2016

In September and October 2016, Dr. Sammons and her colleagues reported to the CHOP IP&C Committee about the outbreak. She stated the discussion "included practice analysis and next steps to improve the quality of health care rendered, improve procedures, and monitor compliance with IP&C procedures." Dr. Sammons' Aff., at ¶ 29. She stated the IP&C committee "evaluated the outbreak response by Infection Prevention providers and NICU providers, evaluated ophthalmologist practices, discussed monitoring of compliance with hospital policies and procedures, and evaluated next steps to prevent recurrence." *Id.* at ¶ 30.

The majority found the PowerPoint slides and the minutes from the IP&C Meetings protected by MCARE. Majority at 28. It reasons that the IP&C Committee is a peer review sub-committee of the Patient Safety Committee and that the slides were prepared to present to the meeting and assist in evaluating the outbreak response. *Id.* It found this established they were presented in accordance with Section 310(b). *Id.* It therefore found the slides protected under MCARE, without addressing whether the PRPA applied. *Id.* at 29.

I would conclude the PRPA cannot apply, because the IP&C Committee was a multi-disciplinary committee and included non-physicians and lay community. *See* 63 P.S. § 425.2; *Ungurian v. Beyzman*, 232 A.3d 786, 798 (Pa.Super. 2020) (finding PRPA requires peer review activities be conducted by professional healthcare providers and the defendant's failure to identify

members of the peer review committee was fatal to claim PRPA privilege applied); N.T., Oct. 6, 2020, at 177-79 (the IP&C Committee included members of medical staff, non-physician infectious disease preventionists, and representatives from the "environmental services department," which provides janitorial services).

Further, as with the other documents, I would conclude the slides were created in response to the outbreak, and CHOP did not establish the slides were created, or the meeting was held, solely to fulfill an obligation of the Patient Safety Committee. Therefore, the slides and meeting minutes are not protected from disclosure under MCARE.

In sum, I agree with the learned Majority that the intranet postings and redacted email are not protected by PRPA or MCARE, but respectfully disagree with its conclusions that the remaining documents are privileged.